IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| David A. Williams, Sr. (R-74254), | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 21 C 5047 |
| v. | ) | |
| | ) | Judge Elaine E. Bucklo |
| Dr. Burke, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff David A. Williams, Sr. initiated this lawsuit *pro se* under 42 U.S.C. § 1983 concerning adverse health conditions that he attributes to a medication—nortriptyline—that was prescribed to treat his back pain while he was in pretrial detention at the Kane County Adult Detention Center. According to Williams, the medication is an antidepressant and not properly prescribed for chronic back pain. Williams contends that he now suffers from high blood pressure, facial twitching, and numbness because of taking nortriptyline.

The Court screened the operative complaint under 28 U.S.C. § 1915A and allowed a claim under the Fourteenth Amendment to proceed against the doctor who prescribed the medication, defendant Dr. Patricia Burke. Burke has now moved for summary judgment. For the reasons discussed below, Burke's motion is granted.

**Local Rule 56.1**

Local Rule 56.1 governs the procedures for filing and responding to motions for summary judgment in this Court. Local Rule 56.1 requires the moving party to submit a motion, supporting memorandum of law, and statement of material facts accompanied by cited evidentiary material. N.D. Ill. L.R. 56.1(a), (d). The opposing party then must respond to the moving party's motion and statement of facts. N.D. Ill. L.R. 56.1(b), (e). The opposing party's response to the movant's

statement of facts "must consist of numbered paragraphs corresponding to the numbered paragraphs in the [movant's] statement," N.D. Ill. L.R. 56.1(e)(1), and "[e]ach response must admit the asserted fact, dispute the asserted fact, or admit in part and dispute in part the asserted fact[,]" N.D. Ill. L.R. 56.1(e)(2). "Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." N.D. Ill. L.R. 56.1(e)(3). In addition, if the opposing party wants the Court to consider facts not presented by the moving party, the opposing party also must submit a "statement of additional material facts" consisting of "concise numbered paragraphs" and attaching any additional evidentiary material. L.R. 56.1(b)(3), (d).

Williams is proceeding without the assistance of counsel, so Burke served him with a "Local Rule 56.2 Notice to *Pro Se* Litigant Opposing Summary Judgment," setting forth the procedures for opposing summary judgment and explaining that Williams "must file, as separate documents" a response to Burke's statement of facts, a statement of additional facts, evidentiary material, and a memorandum of law. *See* Dkt. 152. Burke also provided Williams with the text of Federal Rule of Civil Procedure 56 and Local Rule 56.1 as well as guidance on countering Burke's affidavit. *See* Dkt. 149-151.

Even so, Williams filed a single document in response to Burke's submissions, titled "Plaintiff's Answer to the Defendant's Motion for Summary Judgment." Dkt. 157. Williams did not submit a separate response to Burke's statement of facts.[1] He also did not submit a separate statement of additional facts. Instead, he submitted a single document that is composed largely of argument in opposition to summary judgment, interspersed with additional facts and citations to exhibits that follow his written response.

---

[1] The document submitted by Plaintiff is organized by numbered paragraphs, but the paragraphs do not correspond to Burke's Local Rule 56.1 Statement of Facts. *Compare* Dkt. 157 *with* Dkt. 147.

2

The Court may require strict compliance with Local Rule 56.1 from all parties. *See Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 414 (7th Cir. 2019); *Wilson v. Kautex, Inc.*, 371 F. App'x 663, 664 (7th Cir. 2010) (citing *Greer v. Bd. of Educ.*, 267 F.3d 723, 727 (7th Cir. 2001)). The Court therefore deems admitted the facts submitted by Defendant Burke. *See* N.D. Ill. L.R. 56.1(e)(3). That said, the Court has considered Williams's *pro se* status and will consider additional facts submitted by Williams so long as the facts are relevant and supported by citations to medical records or admissible through his testimony. *See Adams v. Falkner*, No. 18 C 8223, 2021 WL 2681891, at *1 (N.D. Ill. June 30, 2021) (Kennelly, J.) (discussing discretion to overlook noncompliance with local rules).

## Background

Plaintiff David A. Williams, Sr. was a pretrial detainee at the Kane County Adult Detention Center ("KCJ") before his conviction and present incarceration at Robinson Correctional Center. *See* Dkt. 147, Def. Stmt. of Facts (DSOF) ¶¶ 1, 23. Before his admission to KCJ, he experienced chronic back pain and had a history of facet arthropathy (a degenerative condition that affects the facet joints in his spine). DSOF ¶¶ 23, 26. He did not have a history of depression. *See* Dkt. 157, Pl. Opp. to Def. Mot. for Summ. J. (Pl. Resp.) ¶¶ 2, 4. On August 22, 2017—during his intake interview—Williams's blood pressure was 120/82. Pl. Resp. ¶ 7. He was 59 years old at the time. *See* Ex. D to Pl. Resp. at 17.

On October 10, 2017, Williams complained to KCJ medical staff about mid-upper back pain that he rated a 10/10 on a scale of 1 to 10. DSOF ¶ 25. The staff who examined Williams noted that he was alert and "oriented times 3" and in no acute distress. *Id.* Medical staff ordered a course of Tylenol. *Id.*

3

Defendant Dr. Patricia Burke became involved with Williams's care at KCJ approximately six months later. *See* DSOF ¶ 26. Burke is a physician licensed to practice medicine in the State of Illinois. DSOF ¶ 2. She obtained her medical degree from Yale University, completed an internal medicine residency, is Board Certified in Internal Medicine, and has worked in primary care medicine for more than 25 years. DSOF ¶¶ 2, 3. She began working as a physician at KCJ in September 2017. DSOF ¶ 4.

Burke attested in a Declaration, submitted in support of her motion for summary judgment, that medical care at KCJ is provided by physicians, nurses, and medical support staff. DSOF ¶ 8. Burke is one of several physicians at KCJ. *See id.* When a person is transferred into KCJ, a member of the nursing staff performs a medical intake evaluation. DSOF ¶ 15. A member of KCJ's nursing staff takes the patient's history, records vital signs, attempts to confirm any prescription medications that the patient might have been taking before admission to KCJ, and assesses whether the patient needs to see a doctor on an expedited basis or whether the patient can wait to be seen by a doctor. DSOF ¶¶ 16, 17. KCJ medical staff record their interactions with patients in an electronic medical records system. DSOF ¶ 20.

On April 16, 2018, Burked received records of the treatment Williams had undergone before his arrival at KCJ. DSOF ¶ 26. The records revealed that Williams had a history of facet arthropathy and that he had previously undergone a medial branch nerve block for lumbar pain, with another one planned but not yet completed. *Id.* He was taking Ultram and Norco and had reported an allergy to Ibuprofen. DSOF ¶ 23. Burke was aware that both Ultram and Norco are subject to abuse and are restricted in the jail environment except under exceptionally rare circumstances, *e.g.*, to treat intractable cancer pain. *Id.* Burke therefore ordered Tylenol and a low

dose of nortriptyline (10 mg twice a day) to treat Williams's complaints of pain. DSOF ¶¶ 23, 26. Burke did not personally meet with Williams. *See* DSOF ¶¶ 5, 52.

Nortriptyline is a medication that is classified as an antidepressant but also may be prescribed at low doses to treat neuropathic pain. DSOF ¶ 24. It is Burke's understanding that nortriptyline is indicated when other forms of medication are not appropriate for a patient. *Id.* It is a preferred medication in correctional environments, such as KCJ, due to a lack of potential for abuse compared to other pain medications, such as Ultram and Norco. DSOF ¶¶ 23, 24.

On October 8, 2018, Burke noted that Williams's blood pressure readings had been consistently elevated and planned to meet with Williams "in a few days." DSOF ¶ 28 (citing Ex. 2 to Burke Decl. at 000374) (hereinafter, Dkt. 147-7 at 000374).[2] A note in Williams's chart reflects, however, that he "refused visit" on October 10, 2018. *Id.* Burke therefore ordered nursing staff to monitor his blood pressure for an additional week. *Id.*

On October 14, 2018, a nurse noted in Williams's chart: "I/P requesting to have nortriptyline to be renewed d/t chronic back pain. MD notified." DSOF ¶ 29 (citing Dkt. 147-7 at 000374). The medication was renewed. *See id.*

On October 17, 2018, Burke again noted that Williams's blood pressure readings were consistently elevated and attempted to meet with him, but Williams again refused the visit. DSOF ¶ 30 (citing Dkt. 147-7 at 000374). Burke also noted that Williams's blood sugar was mildly elevated and arranged for further testing. *Id.* Burke's notes reflect that she asked a nurse to advise

---

[2]Defendant Burke did not attach exhibits to her Declaration. However, the documents referenced in the Declaration are identified by Bates number and available at docket numbers 147-5, 147-6 and 147-7. For ease of reference the Court cites only the docket and Bates numbers.

Williams of her concerns and later ordered medical staff to advise Williams of the risks of not treating his high blood pressure. DSOF ¶¶ 30, 31.

Williams was transferred to custody of the Illinois Department of Corrections (IDOC) on or about April 15, 2019. DSOF ¶ 34. Not long before his transfer, Williams refused a blood pressure check. DSOF ¶ 32 (citing Dkt. 147-7 at 000374). In response, Burke noted: "We are scheduling more." *Id.* Approximately two weeks later, medical staff attempted but were unable to check Williams's blood pressure because he was attending court. DSOF ¶ 33 (citing Dkt. 147-7 at 000374).

Williams's IDOC medical records reflect that he remained on nortriptyline (also known as Pamelor) from April 2019 until April 2021. DSOF ¶¶ 35, 44. IDOC medical professionals also prescribed methocarbamol, carbamazepine, duloxetine, and gabapentin at various times. DSOF ¶ 43 (citing Dkt. 147-6 at 000181-239). On July 14, 2021, Williams completed a medical authorization form asking that his medical records from KCJ be disclosed to healthcare providers at IDOC "so the doctor here can put me back on the nortriptyline." DSOF ¶ 36 (citing Dkt. 147-7 at 000366).

The first record of Williams complaining about health problems that he attributes to the use of nortriptyline appear on June 17, 2023. DSOF ¶ 40. Specifically, he reported facial twitching to an IDOC nurse, and the nurse referred him "to psych." *Id.* (citing Dkt. 147-5 at 000142). Williams returned to the IDOC healthcare unit on August 3, 2023, and again complained about a twitch that he attributed to a medication prescribed "at the County." DSOF ¶ 41 (citing Dkt. 147-5 at 000150). The healthcare provider who saw Williams that day observed no twitching and noted

6

that Williams reported that he had stopped taking the medication in 2021 because "it was for depression[.]" DSOF ¶ 41 (citing Dkt. 147-5 at 000150).

Williams's medical records from KCJ do not reflect that he complained about any adverse health conditions while at KCJ that he now attributes to nortriptyline. *See* DSOF ¶¶ 39, 53. Williams confirmed at his deposition that he did not experience facial twitching, high blood pressure, or numbness while taking nortriptyline; he developed these conditions after he stopped taking the medication at IDOC. DSOF ¶ 55. He also clarified that, while taking nortriptyline, he experienced feelings of sadness and blurred, watery eyes. *Id.* He admitted, though, that no medical providers told him that his use of nortriptyline caused the health conditions that he attributes to nortriptyline. DSOF ¶ 56. Rather, Williams believes that nortriptyline caused his adverse health conditions based on information obtained from his daughter-in-law and told to him by his son. *Id.*

Burke is aware that nortriptyline may cause side effects in some patients. DSOF ¶ 37. Common side effects include dry mouth, dizziness, drowsiness, constipation, low blood pressure, changes in appetite or weight, and blurred vision. *Id.* Less common side effects include irregular heartbeat, changes in mood or behavior, confusion, or seizures. *Id.* A rare side effect is the possibility of elevated blood pressure. *Id.*

Burke is aware that there are many common causes of elevated blood pressure in men over the age of 60. DSOF ¶ 48. She also is aware of no evidence that any blood pressure changes caused by nortriptyline—be it high or low—persist after discontinuation of the medication. DSOF ¶ 48. She does not recall any of her other patients having symptoms beyond dry mouth, drowsiness, and constipation while on low doses of nortriptyline. DSOF ¶ 38.

7

Williams initiated this federal lawsuit in September 2021. He alleged in the operative complaint that he was prescribed nortriptyline by Burke to treat his back pain. Dkt. 22, pg. 6. Unbeknownst to him at the time, nortriptyline is used to treat depression. *Id.* He now suffers from adverse side effects that he attributes to taking nortriptyline for an extended period. *Id.* He asserted in the operative complaint that Burke "caused and participated in [a] constitutional deprivation by not at least talking to me about my condition, instead she prescribed a medicine that is used for depression for chronic back pain." Dkt. 22, pg. 7. He continued: "Dr. Burke recklessly disregarded my health and safety by treating my condition in the wrong manner." *Id.* Based on Williams's allegations and considering the standard applied to *pro se* pleadings, the Court allowed a claim under the Fourteenth Amendment to proceed against Burke. Dkt. 24, Dec. 7, 2022 Order. The Court dismissed all other claims and defendants. *Id.*

Defendant Burke now seeks summary judgment in her favor. Dkt. 146-153.

## DISCUSSION

Burke argues that she is entitled to summary judgment on three bases: (1) her decision to prescribe nortriptyline to treat Williams's chronic back pain was objectively reasonable; (2) the totality of her care was objectively reasonable; and (3) Williams lacks evidence that her treatment decision caused his adverse health conditions. Dkt. 146.

Summary judgment is warranted where the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A disputed issue of fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

8

"[W]hen a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 250. Unsupported facts, bald statements lacking factual support, and facts supported only by inadmissible evidence are insufficient to defeat summary judgment. *See Malekpour v. Chao*, 682 F. App'x 471, 473 (7th Cir. 2017) (explaining that district court may ignore inadmissible evidence or hearsay when considering motion for summary judgment). A party will successfully oppose summary judgment only if he makes "a sufficient showing on every element of his case on which he bears the burden of proof[.]" *Yeatts v. Zimmer Biomet Holdings, Inc.*, 940 F.3d 354, 358 (7th Cir. 2019) (citing *Celotex Corp.*, 477 U.S. at 323).

The Court considers relevant, properly supported evidence in the light most favorable to the non-moving party. *Logan v. City of Chicago*, 4 F.4th 529, 536 (7th Cir. 2021). The Court "refrain[s] from making credibility determinations or weighing evidence." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 467 (7th Cir. 2020) (citing *Anderson*, 477 U.S. at 255). The Court draws reasonable inferences in the nonmoving party's favor, but not speculative inferences. *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016).

### A. Medical Care Under the Fourteenth Amendment

The Fourteenth Amendment's objective reasonableness standard, not the Eighth Amendment's deliberate indifference standard, governs claims brought by pretrial detainees for inadequate medical care. *Swisher v. Porter Cnty. Sheriff's Dep't*, 761 F. App'x 616, 620 (7th Cir. 2019) (citing *Miranda v. Cnty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018)). Courts therefore must "focus on the totality of facts and circumstances faced by the individual alleged to have provided inadequate medical care and to gauge objectively—without regard to any subjective belief held by

9

the individual—whether the response was reasonable." *Id.* (quoting *McCann v. Ogle Cnty.*, 909 F.3d 881, 886 (7th Cir. 2018)).

"The plaintiff bears the burden to demonstrate objective unreasonableness[.]" *James v. Hale*, 959 F.3d 307, 318 (7th Cir. 2020). To prevail on his claim, the plaintiff must first "show that the defendant acted purposefully, knowingly, or recklessly when considering the consequences of [her] response to the medical condition at issue in the case." *Id.* (citing *McCann*, 909 F.3d at 886). The plaintiff then "must show that the challenged conduct was objectively unreasonable in light of the totality of the relevant facts and circumstances." *Id.*

Williams presented no evidence from which a reasonable jury could find that Burke's decision to prescribe nortriptyline for his back pain was objectively unreasonable. Intentional and deliberate, yes. But no evidence suggests that Burke's decision was reckless or poorly considered.

Burke presented evidence that it was known to her that nortriptyline may be used for and can be effective in treating nerve pain. Burke considered Williams's medical history as well as the medications available to treat chronic pain in a correctional setting before prescribing the medication. She was aware of the potential side effects but had never observed serious side effects in the patients to whom she had prescribed nortriptyline. She therefore believed nortriptyline would be an effective treatment. Williams produced no evidence that calls into question the reasonableness of Burke's decision. *See, e.g., Osborne v. Dorris*, No. 3:16-CV-1292-JPG-MAB, 2019 WL 2517086, at *3, 6 (S.D. Ill. May 10, 2019) (finding nurse's substitution of nortriptyline for gabapentin objectively reasonable).

Burke also presented evidence suggesting that nortriptyline was effective at managing Willams's pain and that Williams rebuffed her attempts to address his high blood pressure.

10

Williams does not dispute these facts. He argues only that Burke should have tried to see him sooner, Dkt. 157, pg. 3, which is a non-starter given that Burke offered to meet with Williams within a few days of noticing his consistently elevated blood pressure readings and, when Williams refused the meeting, Burke took steps to have medical staff monitor his condition and advise him of the risks of not treating elevated blood pressure. *See, e.g., Ford v. Cnty. of Winnebago*, No. 3:19-cv-50056, 2022 WL 180569, at *7 (N.D. Ill. Jan. 20, 2022) ("At bottom, a detainee cannot refuse medically accepted treatment only to turn around and contend that the doctor unconstitutionally failed to treat his serious medical condition.").

The bulk of Williams's argument is his assertion—for the first time in opposition to summary judgment—that he was not alerted to the "serious side affects [sic]" of nortriptyline and had a right to refuse treatment "had he known what he was taking and the serious side affects [sic] that come with it." Dkt. 157, pg. 1-2. He cites *Spillard v. Ivers*, 19-cv-01407-JST (N.D. Cal. Jan. 25, 2024), in support of his argument, but that order is not precedential. Similarly, a second case cited by Williams—*Hart v. Cogburn*, No. 2:19-cv-01193-DGE-BAT (W.D. Wash. Nov. 8, 2021)—is not on point given that the facts of *Hart* differ significantly from the facts of Williams's claim in this case. But that is not the end of the analysis.

In *Knight v. Grossman*, 942 F.3d 336 (7th Cir. 2019), the Seventh Circuit recognized a Fourteenth Amendment due process right to informed consent that is similar to the right identified in the cases cited by Williams. *See, e.g., Spillard v. Ivers*, No. 21-16772, 2023 WL 4992827, at *1 (9th Cir. Aug. 4, 2023) (finding due process right "to be free from unjustified intrusions to the body, to refuse unwanted medical treatment and to receive sufficient information to exercise these rights intelligently[.]"). The Seventh Circuit established in *Knight* that to prevail on a claim that

11

an inmate was denied his right to informed consent, the inmate "must prove that (1) he was deprived of information that a reasonable patient would deem necessary to make an informed decision about his medical treatment, (2) the defendant acted with deliberate indifference to the prisoner's right to refuse treatment, and (3) if the prisoner had received the information, he would have refused the treatment." *Knight*, 942 F.3d at 343.

Burke did not address Williams's claim under the *Knight* standard, focusing instead on the totality of care standard set out in *Miranda*, which is how the claim was defined in this Court's screening order. *See* Dkt. 24. For the sake of completeness, however, the Court has considered Williams's argument—which represents a shift in his theory of the case that was not pleaded in the operative complaint—under the *Knight* standard.

For an informed-consent claim, the phrase "deprived of information" implies more than the mere failure of a healthcare provider to preemptively advise a detainee about every known risk of a medication. Indeed, the Fourteenth Amendment does not mandate comprehensive disclosures. *See Spillard*, 2023 WL 4992827 at *2 (Miller, J., concurring) ("No court has held that an inmate must receive every piece of information about a [] drug in order for the administration of that drug to be voluntary."). Where an inmate is able to ask for more information but does not do so, his due process right is not necessarily violated. *See id.* This means that Burke's failure to personally advise Williams of nortriptyline's uses and risks before prescribing the medication is not enough, by itself, to show that Burke participated in a constitutional deprivation. *See Anderson*, 477 U.S. at 252 (explaining that a mere "scintilla of evidence" will not defeat a defendant's motion for summary judgment).

12

Williams's argument suggests that he received no information about the side effects or risks associated with taking nortriptyline, but he presented no evidence that he asked for information about the medication and was deprived of the requested information. He also submitted no evidence that Burke was deliberately indifferent to his right to refuse treatment. Uncontested evidence shows, instead, that a nurse reported that Williams asked to renew the nortriptyline prescription on or about October 14, 2018, and Williams continued taking the medication as prescribed while in custody at KCJ from April 2018 to April 2019. Evidence also calls into question Williams's presumptive position now that he would have refused to take nortriptyline if Burke had informed him of known, potential side effects given that he submitted a request in July 2021 (after having a history of elevated blood pressure) for proof that he had been taking nortriptyline "so the doctor [at IDOC] can put me back on the nortriptyline." Dkt. 147-7 at 000366.

Importantly, the Court's consideration of Williams's claim under *Knight* is based on presumptions gleaned from his arguments in opposition to summary judgment. He submitted no evidence whatsoever addressing the elements of a claim stemming from a purported lack of informed consent.

Williams briefly makes two additional arguments in opposition to summary judgment. He argues that Burke "interfered with the treatment prescribed by" his outside specialists, Dkt. 157, pg. 1, but Burke was allowed to exercise her medical judgment within the parameters allowed by KCJ without running afoul of the Constitution. *See Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 764-65 (7th Cir. 2021) (allowing medical professionals to "default to the security needs of the prison unless the medical professional determines that an exemption is required for medical

13

reasons"). Williams also argues that Burke "deliberately disregarded" his medical needs because she did not personally meet with him, Dkt. 157, pg. 5, but the fact that Burke did not meet with Williams is not evidence that her treatment decisions were objectively unreasonable.

In sum, undisputed evidence shows that Burke consulted the nurses' notes and reviewed Williams's medical history before prescribing nortriptyline to treat Williams's back pain. Burke also followed up when she noticed adverse events in Williams's medical chart. Williams was not responsive to Burke's concerns. Williams might have preferred a different course of care in hindsight, but he submitted no evidence that he made his concerns known to Burke while he was under her care or that Burke's treatment decisions—*i.e.*, to prescribe nortriptyline or to monitor Williams's blood pressure after he declined to meet with her—were objectively unreasonable.

**B.    Causation**

Williams also submitted no evidence that Burke's decision to prescribe nortriptyline or her purported failure to treat his high blood pressure caused an injury. "[A] plaintiff claiming injury has the burden to offer some evidence of causation." *Meneweather v. Ritz,* No. 24-1214, 2025 WL 66040, at *3 (7th Cir. Jan. 10, 2025). Here, Williams offered nothing but speculation and hearsay to support his contention that his high blood pressure, facial twitches, numbness, or any other adverse health conditions were caused by nortriptyline. *See Pearson v. Ramos*, 237 F.3d 881, 886 (7th Cir. 2001) (finding that the plaintiff was "[w]holly lacking in medical knowledge" and "incompetent to testify on" causation). Similarly, he offered no evidence that failure to treat his high blood pressure while at KCJ caused an injury. *See Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013) ("[n]o matter how serious a medical condition is, the sufferer from it cannot prove tortious misconduct (including misconduct constituting a constitutional tort) as a result of the

14

failure to treat the condition without providing evidence that the failure caused injury or a serious risk of injury.").

## **CONCLUSION**

Defendant Burke is entitled to summary judgment for the reasons discussed above. The Court therefore grants Burke's motion for summary judgment (Dkt. 146). Final judgment will be entered in Burke's favor and against Williams. This case is closed.

**Enter Order:**

Date: January 7, 2026

Elaine E. Bucklo
United States District Judge